Willie E. **TODDY**, Plaintiff,

v.

**ARKANSAS VALLEY DREDGING CO.**, Defendant.

No. LR–C–77–189.

United States District Court, E. D. Arkansas, W. D.

May 23, 1979.

Henry Woods, Little Rock, Ark., Sam H. Boyce, Newport, Ark., for plaintiff.

Carroll C. Johnson, Memphis, Tenn., for defendant.

## OPINION

ARNOLD, District Judge.

This is an action against the plaintiff's employer for negligence and unseaworthiness under the Jones Act, 46 U.S.C. § 688, and general maritime law. There were originally three defendants, but summary judgment was granted as to Ike Carter, Jr., and Carter Construction Company on the ground that there was no evidence that either of them was the employer of the plaintiff or owned the vessel alleged to be unseaworthy. The case was tried to the Court sitting without a jury on May 8 and 9, 1979.

Willie E. Toddy is 39 years old. He is married and has four children. He has a fourth-grade education, but reads only at a second grade level. He is functionally illiterate. His I.Q. is 87. He has held various jobs in the construction business, and at the time of the accident involved in this case was a welder employed by the Arkansas Valley Dredging Company. He has also been licensed as a pilot of a boat.

Arkansas Valley had a contract with the Corps of Engineers for dredging on the White River. A number of vessels owned by Arkansas Valley were used in carrying out the contract, including two dredges, a skiff, a runabout (powered by an outboard motor), and several barges. Plaintiff worked on all of these vessels, but mostly on the welding barge. He was Arkansas Valley's head welder and was a skilled workman. One other welder, his brother

Bobby Toddy, worked under him. Welding was necessary to keep in order the equipment with which Arkansas Valley was dredging the river. Plaintiff worked 12 hours a day, seven days a week, which was customary for dredging operations. His work was essential to the mission of the dredging vessels, and he was therefore a seaman within the meaning of the law.

Arkansas Valley provided no sleeping quarters for its employees on any of its vessels, so it was necessary for plaintiff to be picked up each morning at some point on the bank of the White River designated by the employer. On the morning of August 20, 1974, Arkansas Valley was using a boat referred to as the "engineers' skiff" to pick up its employees. The pick-up point was six miles north of Des Arc. Arkansas Valley had been using this pick-up spot for three days. The skiff in question was about sixteen feet long, had a 50-horsepower motor, and had a small cabin on its deck. At one end of the boat was a bow plate on which it was necessary for the men to step when entering the boat. The plate was muddy, bent downwards, and missing some of its rivets. No particular means of ingress was provided by Arkansas Valley, such as a rope, The men were simply expected to get from the bank into the boat the best way they could. At this particular location the bank was six to eight feet high and quite steep. It was almost perpendicular, though there was a small ledge, probably about a foot wide, part of the way down. It had rained the night before, and the bank was slippery. No steps had been cut in it, nor had any hand rail been erected, though Arkansas Valley had cut steps in the bank at another location on the river.

On August 20, 1974, plaintiff crouched down at the top of the bank to swing himself down into the boat. His feet slipped while he was still on the bank, and he slid down into the boat. His feet struck the bow plate, but his fall did not stop there. His back also struck the bow plate. It was a hard fall.

■ The liability of defendant for this fall and its legal consequences is clear.

Picking up the plaintiff at a steep and slippery bank at which no steps or guard rail had been provided, with a boat that lacked any means of ingress or egress, clearly created a risk of exactly what happened, and the risk was foreseeable by a reasonable person. In addition, the vessel was unseaworthy. Most of the witnesses testified that the plaintiff's feet did hit the bow plate. If the plate had not been muddy, or had not been bent, plaintiff's feet might have held instead of sliding farther, causing him to strike his back. But this defect in the boat is not the crucial fact here. Even if the bow plate had been in proper condition, or even if plaintiff's feet had not landed on it before he struck his back, the boat would be unseaworthy because of the failure of the employer to provide a safe means of ingress and egress. It is true that the shipowner is not obligated to provide a seaworthy dock, and the mere fact that the bank was steep and slippery would not make the vessel unseaworthy. The crucial point is that no safe means of getting from the bank into the boat was provided. This failure was a breach of the warranty of seaworthiness owed by the shipowner to its seamen. See, e. g., *Romero Reyes v. Marine Enterprises, Inc.,* 494 F.2d 866 (1st Cir. 1974); *Tullis v. Fidelity & Casualty Co.,* 397 F.2d 22 (5th Cir. 1968). A vessel with defective means of ingress and egress, or with no such means, is not seaworthy.

■ Was the plaintiff himself negligent? If so, his recovery on either theory must be reduced pro tanto. Defendant argues that the plaintiff was negligent in jumping from a high bank into the boat, and if plaintiff had in fact jumped off the bank from a standing position directly into the boat, this position would have merit. Here, however, plaintiff crouched down on the bank before swinging himself down with his arms into the boat. No safer means of entering the boat was provided by the employer or suggested by the evidence. The employee had two choices—attempt to lower himself into the boat as he did, or simply refuse to go to work. It was not unreasonable of him, in

the circumstances, to attempt to enter the boat as he did, and the employer which created these circumstances must bear the legal consequences.

A question of causation remains. Defendant claims that whatever disability plaintiff now has is the result not of his fall on August 20, 1974, but of subsequent incidents, including what may have been another fall on November 12, 1974, and apparent later back injuries sustained by plaintiff at home while chasing chickens and fixing a pump.

After the fall on August 20, plaintiff stayed on the skiff and went on to work, but he was in pain all that day and worked with difficulty. The next day he went to see Dr. Thomas A. Formby in Searcy, Arkansas. Dr. Formby examined him and found that he had a bruise on the right side of his back and quite a bit of muscle spasm. He prescribed muscle relaxants, pain medicine, bed rest, and Williams back exercises. On August 23, plaintiff was feeling much better, and the doctor gave him permission to return to work the following Monday, August 26. Plaintiff did return to work, but he was never able to work effectively. He became slower and slower, was unable to lift heavy weights, and needed help from co-workers. Finally, on November 13, 1974, he left work for good (except for a short period of time in 1975 that will be described later.) The circumstances of plaintiff's leaving the job on November 13 are in dispute. By this time he was no longer on the river but was working on land at a shipyard in North Little Rock, still as a welder. He was strengthening the lengths of a dragline chain that extended on both sides of a dragline bucket. According to plaintiff, nothing particular happened on November 12 or 13 to cause him to go back to the doctor. The medical testimony is plain, however, that when the plaintiff returned to Dr. Formby on November 13, 1974, he reported that he had again hurt his back while lifting a large chain. Other medical records indicate that plaintiff stumbled over the dragline bucket. Dr. Formby's diagnosis on November 13 was "low back strain resulting from fall and aggravated by lifting heavy chain."

The plaintiff was admitted to White County Hospital, where he stayed until November 27, 1974. On that day Dr. Formby referred him to Dr. Richard J. Nasca, a specialist in Little Rock, who put Mr. Toddy in St. Vincent's Infirmary. The history taken by Dr. Nasca again indicates that a definite second injury had occurred on November 12. In addition, Mr. Toddy told Glenn Worley, a registered physiotherapist at White County Hospital, that he had had a second injury while pulling a chain with a twisting motion, and that on that occasion he had felt an audible click in his back with an immediate burning sensation.

Plaintiff flatly denied this second injury, and his brother, Bobby Toddy, who was working with him at the time, backed up his denial under oath. Plaintiff also denied stumbling and falling later on, some time in 1975, while chasing chickens, as well as a similar incident at a pump house. The Court is unable to credit these denials. The testimony of Dr. Formby, Dr. Nasca, and, through his written report, Mr. Worley, is unanimous that plaintiff reported a second injury while working on a dragline chain. Dr. Nasca's records, in addition, are quite clear that additional injuries were sustained later in the chicken and pump-house incidents. Certainly there is no reason for these medical persons to fabricate. There are, to be sure, minor discrepancies among the various "histories" taken by the doctors, but this circumstance is to be expected. The Court finds that plaintiff did injure his back on the three separate later occasions in dispute.

 Under the controlling law, however, this fact cannot serve to diminish defendant's liability. Under the Jones Act and maritime law, defendant's breach of duty need not be the sole cause of the injury sued for, or even the proximate cause in the common-law sense. Under the Jones Act, which incorporates the Federal Employers' Liability Act, defendant is liable for injuries caused "in whole or in part" by its negligence, 45 U.S.C. §§ 51, 52. Here,

defendant argues that its negligence must be at least a substantial partial cause, and this Court does not disagree. This standard is clearly met by the evidence before the Court. Even if the later incident on November 12, 1974, did play a substantial part, there was unquestionably a serious pre-existing injury. Dr. Nasca described the August 20, 1974, fall as "the significant initial injury." Later, in speaking of the same fall, he said: "I would have to say in all fairness that this was a contributing factor." Dr. Richard Logue was of the same opinion—that is, that the August 20, 1974, fall was at least a partial cause of plaintiff's condition.

The question of damages remains. Plaintiff claims the following elements of damage: pain and suffering; permanent physical impairment; past lost wages; and loss of earning capacity for the future. The parties have stipulated that defendant has paid plaintiff maintenance in the amount of $13,259. It is agreed that this sum should be subtracted from any judgment, in order to avoid a double recovery. In addition, it is stipulated that $6,344.07 in medical expenses have been paid by the defendant on behalf of the plaintiff. No recovery is sought for this amount, or for any other medical or drug expenses, past or future.

The Court believes that plaintiff's failure to work after November 13, 1974, was the result, for legal purposes, of defendant's breach of duty. Plaintiff's economist, relying on his knowledge of practice in the maritime industry, has computed the claim for past lost wages at $117,276.10. This claim is excessive. It is based upon the assumption that plaintiff would have worked 75 hours a week, 52 weeks a year, the equivalent, when overtime is figured in, of 92 hours on a straight-time basis. Plaintiff was working seven days a week, 12 hours a day, when the accident occurred, but it is unrealistic to assume that the same pace would have been kept up permanently. For one thing, this strenuous work schedule is characteristic only of work on dredges actually employed in rivers. Not all of plaintiff's work as a welder was in this location. When he moved to the yards at North Little Rock, for example, work typically was reduced to eight or ten hours a day, five or six days a week. In addition, all of plaintiff's work history had by no means been in maritime industries.

■ A fairer basis for computing his earnings, the Court finds, is the actual history of money earned in the years 1971, 1972, 1973, and 1974, for which income tax returns are in evidence. The plaintiff's wages for these years, after excluding expenses for which he was reimbursed, were as follows: 1971, $9,838; 1972, $8,075; 1973, $11,157; and 1974, $17,165. The last figure, that for 1974, covered only part of a year, so it should be annualized before an average of the last four years of plaintiff's work history is struck. There were 316 days in that part of 1974 ending on November 12, and 49 days in the remainder of the year. If plaintiff had earned at the same rate through the end of 1974, his gross wages, after excluding reimbursed expenses as noted above, would have been $19,826.66. Using this as the wage figure for 1974, and averaging it with the figures given above for 1971, 1972, and 1973, an annual earning capacity of $12,224.17 results. At the time of his fall, plaintiff was earning $4.75 as a welder. The only testimony in this record about present earnings by welders is that they are $5.50 an hour. The average of these two figures is $5.12½ (the assumption is that welders' wages present.) Applying this factor to account for welders' improved condition in 1979, an annual earnings capacity figure is obtained of $13,189.24 ($12,224.17 × 5.125 divided by 4.75.) Plaintiff has been out of work the full years of 1975, 1976, 1977, and 1978, with the exception of five days in 1975. He was also out of work 49 days in 1974 and, at the time of trial, 129 days in 1979. He is therefore entitled to lost back wages of four years and 173 days. This figure comes to $59,008.30, and the judgment will include an award of this amount for past wage loss.

Plaintiff's economist testified to a method for determining future wage loss, and the Court agrees with the method in gener-

al, though not with the specific assumptions underlying the economist's computations. A certain stream of income is assumed for a certain time period in the future, in this case until plaintiff reaches the retirement age of 65, and this income stream is diminished each year by the likelihood of demise for a white male plaintiff's age. The resulting figure is then discounted at a rate of 2.0%, which is the real value of money in constant dollars. This so-called "real value of money" is the difference, roughly speaking, between the long-term yield on government securities and the inflation rate, figured over a long period of time, about 30 years. In other words, a prudent investor, looking for a place to preserve the value of his money and also to make a reasonable profit, would invest his money at about 2% above the inflation rate. This 2.0% margin, has remained, on the average, fairly constant. It represents a fair way to arrive at the real present value of a future sum of money, and excludes all of the speculative factors that would have to be dealt with if the Court were forced to forecast what inflation would be in the future.

The formula also excludes any effect of income taxes. At the trial defendant objected to this feature of the formula, and the Court overruled the objection. The Court believes that the future of income taxation is too speculative to be taken into account, particularly when we are talking about a time span extending into the twenty-first century. In any case, the result would not change here, even if the proffered factor were taken into account, because the plaintiff's economist, testifying on cross-examination as part of an offer of proof made by defendant, stated that the factor of income taxation would not produce a net change in the total amount assigned as future wage loss. The reason is that credit would also have to be given the plaintiff, if taxes were taken into account, for the fact that interest on the invested amount of the judgment would be taxable, thus diminishing the real value of the judgment to him. On the whole, it is better to leave income taxes out of the case altogether, at least where we are dealing with future income of a still-living injured person.

The Court must, however, reject the specific figure ($485,299.42) testified to by the economist. This figure, as indicated above, is based upon an unrealistic expectation as to plaintiff's work habits absent the injury. It is more realistic, in this Court's opinion, to base an award for lost earning capacity on plaintiff's actual earnings record, which, as computed above, indicates an earning capacity in the base period 1971–74 of $13,189.24. Since this annual capacity was based upon an hourly wage for welders of $5.12½, which wage is now $5.50, the figure should be proportionately increased, and the resulting figure for annual earnings capacity is $14,154.31. This figure is a reasonable approximation•of the earning capacity that plaintiff would have today if he had not been injured. If plaintiff were totally and permanently disabled, he would be entitled to an award of this amount for each year until age 65 (normal retirement age), discounted at the rate of 2.0% as explained above.

The Court is not persuaded that plaintiff's disability is total. There appears to be no question of its permanence. Both Dr. Logue and Dr. Nasca agree on that point. "He is just going to be like he is now for the rest of his days or worse." (Nasca Dep. 60). On the question of the seriousness or extent of the injury, however, Dr. Nasca's testimony is less favorable to the claimant, and this Court accepts his opinion as the best available, in view of the fact that he saw the plaintiff many more times than either of the other two physicians involved with the case. Dr. Nasca performed a laminectomy on plaintiff on January 2, 1975, and found that he had a definite herniated disc, which was removed. The plaintiff improved sporadically after this, and Dr. Nasca urged him to go back to work on several occasions. He did so for five days in 1975, but testified that he simply was unable to continue, and he has not worked since.

Dr. Nasca stated quite clearly, and several times, that plaintiff's complaints of pain and disability are out of proportion to the objective physical findings. For example,

when plaintiff was re-admitted to St. Vincent's Infirmary, he was observed by hospital personnel to be free of pain on several occasions. His complaints of pain on raising his leg were out of keeping with the usual physical expectations. His right leg was not atrophied. There was no deficit in the circumference of its calf and thigh, which probably would occur if plaintiff were suffering from a significant neurological deficit. After he went back to work for a week in 1975 and quit because of complaints of pain, Dr. Nasca found that the motion in his back had improved and that he was able to walk long distances. He recommended that plaintiff go back to work at a less demanding job. On April 8, 1976, Dr. Nasca's records reveal that plaintiff had been doing a lot of chores around the house. It was decided that further surgery would probably not be of any benefit. When Dr. Nasca last saw the plaintiff on April 17, 1979, he reported that the plaintiff did not walk erect, but that no motor weakness could be found to explain this pattern of gait. The symptoms, he testified, could not be explained on the basis of just a nerve-root injury, which was the principal objective finding. Most individuals in this situation, Dr. Nasca said, get back to gainful employment. "His findings are way out of proportion to the extent of pathology found" (Nasca Dep. 36.) Dr. Nasca was of the view that in time the plaintiff should be able to get back to work. "If your physical examination is not consistent then there's something the patient is— he may be malingering" (Nasca Dep. 54.) "He had his hip flexed, his knee flexed and his foot in a quanis invarious and I don't know of anything that can give you that. You know one nerve root lesion just doesn't give you that kind of picture" (Nasca Dep. 59.) "I think it is very difficult to deal with this man and I think he does not give straight answers" (Nasca Dep. 60.)

Dr. Nasca's conclusion was that plaintiff had sustained a permanent physical loss of function of 15 to 20% to the body as a whole. He was clearly of the opinion, and this Court accepts his opinion, that plaintiff could return to some type of gainful employment, though probably not to the heavy work of welding. It is reasonable to expect that earning capacity will be impaired to an extent somewhat greater than the functional physical disability as such. Under the circumstances, the Court believes it is fair to hold the defendant responsible for a 30% loss in earning capacity. The computation of future lost earnings indicated above should, therefore, be adjusted accordingly in order to obtain the proper figure to be figured in the judgment.

What dollar value should be placed upon plaintiff's pain and suffering and his permanent physical impairment? So far as the Court knows, there is no good way, or at least none that can be rationally articulated, to translate these elements of damage into numbers. Neither party has suggested what might be the proper dollar award for these items. Considering all the facts, the Court is of the opinion that plaintiff is entitled to the sum of $10,000 for pain and suffering and $15,000 for permanent physical impairment. These sums should be included in the judgment, without being discounted. The degree of permanent physical impairment suffered has already been described. As to pain and suffering, the testimony from plaintiff and his wife was rather general and would not, in this Court's opinion, support a larger award, especially in view of the doubtfulness of plaintiff's testimony on other points, already discussed.

Counsel for plaintiff should cause the necessary computations to be made, prepare a form of judgment, and submit it to counsel for defendant for approval as to form. This form of judgment should then be submitted to the Court for its consideration.